UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY,<br><br>                              Plaintiff,<br>v.<br>DESERT CANYON PHASE II, LLC, et al.,<br><br>                              Defendants. | Case No. 2:12-cv-01463-JCM-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION** |

This case was referred to me by the district judge to conduct a hearing on the fair market value of the property at the time of the trustee's sale as required by NRS 40.457. The hearing was held October 5, 2015. Jeremy Nork and Nicole Lovelock appeared on behalf of the Plaintiff Branch Banking and Trust Company. Erika Turner, Robert McCoy, and Jerry Gordon appeared on behalf of the Defendants. The court heard testimony. The parties rested. Defense counsel requested an opportunity to file post-hearing briefs. As the parties had engaged in extensive pre-hearing motion practice, the court denied this request, but required counsel for both sides to submit proposed amended findings of fact and conclusions of law. The court has now considered the testimony and evidence admitted during the evidentiary hearing, the parties' moving and responsive papers, and Proposed Findings of Fact and Conclusion of Law (Dkt. ##102, 103) submitted by both sides. For the reasons explained below, the court concludes that the fair market value of the property at the time of the trustee's sale was $5,916,300.

## BACKGROUND

The Complaint (Dkt. #1) in this case was filed August 17, 2012. Plaintiff Branch Banking and Trust Company ("Branch Banking") is the successor in interest to non-party Colonial Bank by acquisition of assets from the FDIC as receiver for Colonial Bank. The

1

complaint asserts claims for breach of guarantee, breach of the covenant of good faith and fair dealing, and also seeks a deficiency judgment. Branch Banking's claims arise out of an April 23, 2008 promissory note secured by a deed of trust executed by Defendant Desert Canyon Phase II, LLC ("Desert Canyon"). The note secured a loan from Colonial Bank in the original principle amount of $9,364,000. The individual and corporate Defendants executed guarantees, promising to repay the present and future indebtedness of Desert Canyon.

Colonial Bank was closed by the Banking Department in the State of Alabama on August 14, 2009, and the FDIC was named as receiver to liquidate and distribute its assets. The same day, the FDIC assigned all of its rights, title, and interest under the loan documents to Branch Banking. Desert Canyon failed to pay the outstanding principle balance plus accrued interest due by April 23, 2010. On August 12, 2011, Branch Banking served a demand letter upon Desert Canyon and the individual guarantors. Desert Canyon and the guarantors failed to pay the balance due. On February 29, 2012, a trustee's sale was held and the property was sold to Branch Banking for a credit bid in the amount of $2,780,000 in partial satisfaction of the note.

On June 2, 2014, the district judge granted Plaintiff's motion for summary judgment on all issues except for the fair market value of the property at the time of the trustee's sale. *See* Order (Dkt. #52). On July 20, 2015, the district judge referred the case to the undersigned to hold an evidentiary hearing as required by NRS 40.457(1). *See* Minute Order (Dkt. #87).

### DISCUSSION

**I.    Legal Standard.**

Nevada law defines fair market value "as the price which a purchaser, willing but not obligated to buy, would pay an owner willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." *Unruh v. Streight*, 615 P.2d 247, 249 (Nev. 1980). However, in the context of a foreclosure sale, the sale price is not necessarily an indication of a property's fair market value. *See Halfon v. Title Ins. & Trust Co.*, 634 P.2d 660, 661 (Nev. 1981). In foreclosure cases, fair market value is determined by the court. *Branch Banking & Trust Co. v. Smoke Ranch Dev., LLC*, 92 F. Supp. 3d 998, 1001 (D. Nev. 2015).

NRS 40.457 outlines the procedure for determining fair market value. It requires the court to hold a hearing and take evidence concerning the fair market value of the property sold as of the date of foreclosure sale or trustee's sale before awarding a deficiency judgment. NRS 40.457(1). An evidentiary hearing is mandatory. *Branch Banking & Trust Co. v. Pebble Creek Plaza*, *LLC*, 46 F. Supp. 3d 1061, 1076 (D. Nev. 2014). At an evidentiary hearing to determine fair market value, the court may consider "all relevant evidence in determining the value of the property." *Unruh*, 615 P.2d at 249; *Tahoe Highlander v. Westside Fed. Sav.*, 588 P.2d 1022, 1024 (Nev. 1979). Additionally, the court may, on application of either party or on its own motion, appoint an appraiser to appraise the property sold as of the date of the trustee's sale. NRS 40.457(2).

The Nevada Supreme Court has held that held that a secured creditor bears the burden of proof for every element of a deficiency judgment, including the actual sale price at the trustee's sale and the fair market value of the property at the time of the trustee's sale. *First Interstate Bank of Nevada v. Shields*, 102 Nev. 616, 619, 730 P.2d 429, 431 (Nev. 1986) (stating it was clear that the Legislature intended to require lenders seeking deficiency judgments against any potentially liable defendants to prove the actual existence of a deficiency); *see also Miller v. Assurity Life Ins. Co.*, 2014 WL 859230 at *2–3 (Nev. Feb. 28, 2014) (citing NRS 40.457, NRS 40.459(1), *Greathouse v. Charter Nat'l Bank-Southwest*, 851 S.W.2d 173, 176 (Tex. 1992) (discussing a split of authority regarding which party has the burden of proof in the context of deficiency judgments and holding that the burden lies with the creditor)). To support a calculation of fair market value, a party must provide evidence which a reasonable mind might accept as adequate to support its conclusion. *State Emp't Sec. Dep't v. Hilton Hotels Corp.*, 729 P.2d 497, 498 (Nev. 1986).

**II.    Analysis.**

At the evidentiary hearing held to determine fair market value, the court heard testimony from three appraisers: Tio DiFederico, MAI, who was retained by Branch Banking to provide an opinion in connection with this litigation; Luke Adamo, MAI, an appraiser hired by Branch Banking prior to the foreclosure sale; and Richard C. Smith, MAI, an appraiser hired by Desert

Canyon to provide an opinion in this case. The court also heard testimony from individual Defendant Todd Nigro, the manager of the borrower and longtime owner and developer of commercial real estate in Clark County, Nevada.

The parties stipulated to the admission of all three appraisal reports which were marked and admitted as Plaintiff's Exhibit 1 and Defendants' Exhibits 524 and 526. The parties also stipulated, and the court finds, that all three appraisers were qualified to render expert opinions on the fair market value of the subject property. All three appraisers who testified at the evidentiary hearing agreed that the highest and best use of the property on the date of sale was to hold it for future development. All three appraisers used the sales comparison method to estimate fair market value opining it is generally considered the best method to estimate land value.

The property involved in the parties' disputes consists of two parcels of vacant land located at the southwestern corner of Oquendo Road and Quarterhouse Lane in Clark County, Nevada. All three appraisers appraised the two parcels as one property. Parcel A consists of a 13.29 net acre site. Parcel B consists of 18.69 net acres and is located at the southwestern corner of Oquendo Road and Jerry Tarkanian Way. The property is located within the southwestern portion of the Las Vegas valley, south of Russell Road, north of Sunset Road, and east of Fort Apache Road. Parcel A is zoned C-2 (General Commercial) and C-P (Office and Professional). Parcel B is zoned C-2.

Mr. DiFederico opined that the fair market value of the property on the sale date was $3,520,000. His Self-Contained Appraisal Report is dated April 10, 2013. It provided an opinion about the retrospective value[1] of the subject property on the sale date. Richard Smith opined that the fair market value of the property on the sale date was $6,690,000. Mr. Smith's Self-Contained Appraisal Report is also an opinion of the retrospective value of the property on the sale date. Luke Adamo of Britton-Adamo Group/ROI Appraisal, was hired by Branch

---

[1] A retrospective market value opinion is an opinion on market value on a specified date. Market value on a specified or historical date is frequently used in connection with property tax appeals, damage models, lease negotiation, deficiency judgments, estate tax, and condemnation. *See* Dictionary of Real Estate Appraisal at 12 (Appraisal Inst., 5th ed. 2010).

1 Banking in February 2012, to perform an "as is"[2] appraisal before the foreclosure sale. He opined that the "as is" value of the property on February 9, 2012, approximately three weeks prior to the foreclosure sale, was $6,080,000.

Todd Nigro testified that he exchanged an email, which was marked and admitted in evidence as Exhibit 519, with Richard Holmes of Branch Banking in early-September 2011. In that email exchange, Mr. Nigro attempted to amicably resolve the outstanding loan his company owed on the subject property. The email contains a reference to a conversation between Mr. Nigro and Mr. Holmes in which they discussed an appraisal of the property in excess of the loan balance. Mr. Nigro inquired whether Branch Banking would consider a deed in lieu of foreclosure, *i.e.*, allowing Desert Canyon to turn the property over to the bank to "avoid the legal process" and resolve the loan and outstanding guarantees. Mr. Nigro testified that the indebtedness on the property was approximately $6,900,000 at the time of the email exchange and that there was an appraisal obtained by Branch Banking with an August 19, 2011 valuation date for over $7,000,000.

Mr. Nigro also testified about his experience as a longtime owner and developer of commercial real estate in Clark County, Nevada. He did not offer his own opinion of the value of the property, but provided testimony that he developed and occupied office space across the street from the subject property. He indicated that the southwest market of Las Vegas was beginning to improve around the time of the subject sale, and that another parcel of vacant land located one exit up from the subject property was a particularly comparable property to the subject property. All three appraisers relied upon this parcel in arriving at their opinions. A photograph of this comparable parcel was marked and admitted as Defendants' Exhibit 501. This is the parcel referred to in DiFederico's appraisal report as Sale 4, Sale 5 in Adamo's appraisal report, and Sale 5 in Smith's appraisal report. For ease of reference, the court will refer to it as the Hacienda parcel. The Hacienda parcel was sold May 31, 2011, and is located in close proximity to the subject property with similar characteristics, including zoning, location in the

---

[2] An "as is" market value is an estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. *Id.* at 171.

1  southwest part of the valley, and visibility from the Jerry Tarkanian frontage road and the I-215
2  freeway.  The parcel was foreclosed upon by a bank and sold eleven days later.  The Hacienda
3  parcel had more frontage than the subject property and was located on the back-side of a box
4  store complex.  It sold for $185,185/acre.

5  Mr. DiFederico made a qualitative downward adjustment in comparing the Hacienda
6  parcel sale with the subject property.  He opined that a downward adjustment for the subject
7  property was appropriate because the comparable property had a superior location, frontage on
8  Hacienda and over three times the amount of frontage.  A downward adjustment was also made
9  because this comparable was smaller than the subject property in size and had superior off-site
10 improvements.  Mr. DiFederico concluded that based on his qualitative adjustments downward,
11 the unit price at which this comparable parcel sold at $185,185 per net acre is above what the
12 subject's 31.98 net acres could have commanded on February 29, 2012, the date of the trustee's
13 sale.  Mr. DiFederico concluded that the value of the subject property on February 29, 2012, was
14 $110,000/acre, based on his qualitative adjustment analysis that the Hacienda parcel was a
15 superior property, and other comparable sales in his report.

16 Mr. Smith found that the Hacienda parcel was the most similar in size to the subject
17 property of the six comparable sales he used.  From the sales he used for comparison, he found a
18 range of value of $4.36–$6.07/sq. ft. with a mean adjusted value of $4.94/sq. ft.  Considering the
19 weakness of the overall housing and office market, and giving greater weight to the Hacienda
20 parcel sale, he concluded the fair market value of the subject was $4.80/sq. ft., or $6,690,000
21 rounded up.

22 Mr. DiFederico's appraisal report stated that the physical characteristics of the property
23 were suitable for the uses permitted by zoning, including commercial and development.
24 Plaintiff's Exhibit 1, p. 53.  He also opined that most characteristics of the property, including its
25 location in the southwest portion of the valley, visibility from I-215, and zoning were positive
26 attributes that add to the property's desirability in the marketplace.  *Id.*  Mr. Smith's report also
27 concluded that the marketability of the property was good given its frontage along the I-215
28 beltway and commercial zoning, shape, access and exposure.  Mr. Smith concluded that overall,

the subject property provides good utility and is considered desirable in the marketplace. Exhibit 526, p. 26.

The Britton-Adamo Group prepared an appraisal for the "as is" value of the property on February 9, 2012, on behalf of Branch Banking. This appraisal report was marked and admitted as Defendants' Exhibit 524. The purpose of the appraisal was "for internal use, including but not limited to, rendering a decision relative to a financial transaction, asset valuation or foreclosure." Exhibit 524 at p. 1. The Adamo appraisal opined the "as is" value of the property was $6,080,000 on February 9, 2012, approximately three weeks before the trustee's sale.

In arriving at his opinion of fair market value, Adamo noted that street dedications for Oquendo Road, Quarterhouse Lane, and Patrick Lane had been made for the two parcels appraised as a single site. Quarterhouse Lane divides the two parcels from north to south. The Adamo report noted that numerous street dedications of Quarterhouse Lane had been vacated, and he opined that it was therefore likely that this roadway would be vacated. He therefore added 18,600 square feet of land area (620 ft. X 30 ft.) to each of the two parcels believing that the 30-foot wide street dedication along the 600 feet of footage would likely be vacated. This resulted in an increase in parcel size to 32.83 net acres.

The Adamo report did not make any adjustments for superior or inferior quality of the subject property to the Hacienda parcel. However, the Adamo report acknowledged that in general, smaller parcels sell for a higher price per square foot in comparison to a larger parcel based on a number of factors, including a larger pool of available buyers for a smaller property which typically increases demand in price as well as economics of scale. He therefore made downward adjustments to his comparable sales numbers 1, 3, and 5 which ranged from 8.59 to 15.63 acres for their smaller size. Of the eight comparable sales he used to provide an "as is" market value for the fee simple interest in the subject property, he found five comparable sales ranged from $3.86 to $4.44 per square foot with a median price of $4.23 and $4.28 per square foot, respectively. This analysis supported his finding that the subject property's "as is" value as of February 9, 2012, was $6,080,000 based on 32.83 acres times $4.25 per square foot rounded up to $6,080,000.

7

1 Branch Bank sold the property on December 27, 2012, for $3,780,000 after approximately 200 days on the market. The Smith and Adamo appraisals did not consider this sale as their reports were prepared before it occurred. However, Mr. DiFederico's report was prepared in April 2013 after the sale. His report does not mention the sale. Plaintiff's proposed findings ask the court to find that the sale was an arm's length transaction. However, having reviewed and considered all relevant evidence, the court is unable to conclude, on this record, that the December 27, 2012 sale of the subject property was an arms-length transaction for fair market value.

The court gave weight to Mr. Nigro's testimony that the Hacienda parcel was most comparable to the subject property. The court also found Mr. Nigro credible that just prior to his early September 2011 discussion with Mr. Holmes about a deed in lieu of foreclosure, Branch Banking had an appraisal dated in August of 2011 appraising the property at $7,000,000 in excess of the loan balance. His testimony was supported by the email exchange with Mr. Holmes admitted as Exhibit 519 ("Based on our conversation, the last appraisal has the land valued in excess of the loan balance…"). Mr. Nigro testified that he owned and developed office space across the street from the subject property, and that at the time of the trustee's sale the southwest market was beginning to improve.

As indicated, all three appraisers used the Hacienda parcel as a comparable sale. The Hacienda parcel was in close proximity to the subject property. The court found that Mr. DiFederico was generally a credible and persuasive witness. However, the court was not satisfied with his explanation for qualitative adjustments which reduced the value of the subject property to $110,000/acre in comparison with the sale of the Hacienda parcel for $185,185/acre. Mr. DiFederico did testify that the Hacienda parcel had offsite improvements which the subject property lacked. However, there was no testimony in the record to indicate the value of those offsite improvements on the date of the sale.

All three appraisers used the sales comparison approach to estimate fair market value. All three appraisers opined this is generally considered the best method to estimate land value. Mr. Adamo was retained by Branch Banking to perform an "as is" appraisal for the bank's

internal use including rendering a decision relative to asset valuation or foreclosure. Nothing in the record suggests that Mr. Adamo was motivated by anything other than giving Branch Bank his independent professional judgment of the value of the property less than three weeks before the trustee's sale. The other two appraisers were hired to perform appraisals for purposes of this deficiency judgment action. Considering all of the relevant evidence, the court concludes that the fair market value of the property on the date of the trustee's sale was $185,000/acre, or $5,916.300. This is less than the $$6,080,000 "as is" appraisal performed by Mr. Adamo. However, his appraisal was based, in part, on an assumption that the property would gain an additional 18,600 square feet of frontage after street dedications were vacated at some future date.

For the reasons explained,

**IT IS RECOMMENDED** that the court find the value of the property at the time of the foreclosure sale was $5,916,300.

DATED this 14th day of March, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE